# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

DON STRONG, et al.,          )
                                    )
                                    )
        Plaintiffs,          )
                                    )
     vs.                   )       **Case No. 4:17CV1645JCH**
                                    )
REPUBLIC SERVICES, INC., et al.,    )
                                    )
        Defendants.      )

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Motion for Remand.[1] (ECF 21). The matter is fully briefed and ready for disposition.

## FACTUAL BACKGROUND

On May 4, 2017, Plaintiffs filed their Complaint in the Circuit Court of St. Louis County, Missouri (State court). (ECF 10 (Complaint)). As relevant to the pending Motion to Remand, Plaintiffs' Complaint alleges the following: The individual Plaintiffs are all extended members of the Boenker family, and are owners of the Boenker family farm, which lies directly adjacent to the Westlake Landfill and the Bridgton Landfill (jointly, the Landfills); Defendant Republic

---

[1] Defendants also have filed a Motion to Dismiss Plaintiffs' Complaint, which is currently pending. (ECF 15).

Systems, Inc., is and has been responsible for operating the Landfills; Defendant Bridgeton Landfill, LLC, owns the Landfills; in 1988, Defendant Westlake Landfill, Inc., changed its name to Laidlaw Waste Systems, Inc., and, in 1998, merged into Defendant Bridgeton Landfill, LLC; Defendant Allied Services, LLC, is the sole member of Defendant Bridgeton Landfill, LLC, and oversees the operation and management of the Landfills; Defendant Rock Road Industries, Inc., owns and/or owned the West Lake Landfill; Defendants Jared Romaine and David Vasbinder worked at the Bridgeton Landfill; and Plaintiffs are all citizens of Missouri and at least one Defendant is a citizen of Missouri. (ECF 10, ¶¶ 1, 31-37).

Plaintiffs further allege that "Defendants own[ed] and operat[ed] [the Landfills] which accepted radioactive waste without a license to do so"; that the "radioactive waste [] spread to the Boenker family farm causing personal injury, property damage, and the need for medical monitoring"; and that "Defendants have also so mismanaged the Landfills that an underground fire now burns out of control and threatens the nuclear waste." (ECF 10, ¶ 1). Further, in their Complaint, Plaintiffs allege that 40,000 tons of radioactive waste was accepted by the Landfills in 1973; that the radioactive waste came from Cotter Corporation's Latty Avenue site; that Cotter was a "known possessor of radioactive material at the time"; and that neither the Landfills' owner nor operator sought a license from

the Nuclear Regulatory Commission (NRC) prior to accepting and receiving the radioactive material.

Additionally, Plaintiffs allege that Defendants have previously declared to this court that the Price Anderson Act (PAA), 42 U.S.C. § 2011, *et seq.*, does not apply to them because the Landfills were not licensed to accept or receive radioactive materials.[2] Plaintiffs contend that, because Defendants "were not licensed to accept or receive radioactive materials and have not entered an indemnification agreement concerning their acceptance of radioactive materials," the PAA does not apply to Plaintiffs' claims, Plaintiffs' claims "are not public liability actions" under the PAA, 42 U.S.C. § 2210, and Plaintiffs, therefore, may proceed in State court. (ECF 10, ¶¶ 40-41, 43-47). Plaintiffs seek a judgment against Defendants for compensatory and punitive damages caused by Defendants' alleged "intentional, reckless, and/or negligent conduct in owning, operating, and/or managing the [L]andfills." They also seek "Medical Monitoring." (ECF

---

[2]  In *Paulette M. Adams, et al., v. MI Holdings, Inc., et al,* Case No. 4:12CV641, Defendant Rock Road Industries and Defendant Bridgeton Landfill, LLC, argued that the plaintiffs' claims under the Price-Anderson Act should be dismissed because *the West Lake Landfill was not a nuclear facility subject to licensing* by the Nuclear Regulatory Commission (NRC). They further argued that the West Lake Landfill and the Rock Road and Bridgeton Landfills (the Landfills) "ha[d] not ever been[] subject to the Price-Anderson Act"; that the Landfills had "never been engaged in the development, use, and control of atomic energy within the terms of the Atomic Energy Act"; and that the Landfills had never been NRC licensees pursuant to the statutory provisions of the PAA. (Case No. 4:12CV641, ECF 15 at 3, 10).

10, ¶¶ 2, 111-113).

As further relevant to Plaintiffs' Motion to Remand, Defendants have submitted a copy of a Source Material License (the License or 1969 Source Material License) for uranium, issued to Cotter by the Atomic Energy Commission (AEC), on December 3, 1969. The License states that the "[a]uthorized place of use" was Cotter's facility located at 9200 Latty Avenue, Hazelwood, Missouri; that the "[m]aximum quantity of source material which [Cotter] [could] possess at any one time under [the] license [was] unlimited"; and that the License was to expire on December 31, 1974. (ECF 32.1).[3] The License authorized Cotter "to receive, possess and import the [designated] source material [], to use such material for the purpose(s) and at the place(s) designated [], and to deliver or transfer such material to persons authorized to receive it in accordance with the regulations" of Title 10 of the Code of Federal Regulations, Chapter 1, Part 40. (ECF 32.1).

Defendants removed this matter from State court to federal court, on June 9, 2017, pursuant to 28 U.S.C. § 1331, contending that this Court has subject-matter

---

[3] Plaintiffs question the authenticity of the Source Material License, stating that Defendants have not provided an affidavit to verify its authenticity. Plaintiffs also state that, because the document "is not embraced by the pleadings and because Plaintiffs have not "had any opportunity to conduct discovery," the Court should not rely on the document to create jurisdiction. (ECF 38 at 1, 3-4). However, for purposes of the Motion to Remand, only, the Court will assume the document's authenticity. *Cf. Green v. Arizona Cardinals Football Club, LLC*, 21 F. Supp.3d 1020, 1025 (E.D. Mo. 2014) ("Where a complaint raises issues to which federal law applies with complete preemptive force, the [c]ourt must look beyond the face of the complaint in determining whether remand is proper.").

jurisdiction over Plaintiffs' cause of action because it "arises under" federal law, in particular, the PAA, 42 U.S.C. §§ 2011, *et seq.* (ECF 1). In the pending Motion to Remand, Plaintiffs contend that this Court does not have subject-matter jurisdiction and they reiterate the allegations of their Complaint regarding the PAA's inapplicability to this matter. (ECF 21).

## REMOVAL and FEDERAL SUBJECT MATTER JURISDICTION

Except as otherwise expressly provided by Congress, civil actions for which the district courts of the United State have original jurisdiction may be removed from state court to federal district court. 28 U.S.C. §§ 1441(a), 1446. A party opposing removal may file a motion to remand to state court. 28 U.S.C. § 1447(c). The party removing and opposing remand has the burden of establishing federal subject matter jurisdiction. *Iowa Lamb Corp. v. Kalene Indus., Inc.,* 871 F.3d 1149, 1154 (8th Cir. 1994); *In re Business Men's Assur. Co. of America,* 992 F.2d 181, 183 (8th Cir. 1983) (per curiam). Upon considering a motion to remand, a district court is "required to resolve all doubts about federal jurisdiction in favor of remand." *Business Men's Assurance*, 992 F.2d at 183 (*citing Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987)).

"The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded

complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (*quoting Gully v. First Nat'l Bank*, 299 U.S. 109, 112–113 (1936)). *See also Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 542 (8th Cir. 1996) ("The 'well-pleaded complaint rule' requires that a federal cause of action must be stated on the face of the complaint before the defendant may remove the action based on federal question jurisdiction.") (*quoting Caterpillar*, 482 U.S. at 392). Because federal law provides that plaintiffs are the "masters" of their claims, plaintiffs "may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar*, 482 U.S. at 392.

Even in situations where a cause of action based on a federal statute does not appear on the face of the complaint, preemption based on a federal statutory scheme may apply in circumstances where "the pre-emptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim." *Caterpillar*, 482 U.S. at 393 (internal quotation and citation omitted). *See, e.g.*, *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987) (where a former employee alleged breach of contract, retaliatory discharge, and wrongful termination of disability benefits in state court complaint, the court held that the former employee's claims were preempted by the Employee Retirement and Income Security Act (ERISA); plaintiff's claims were necessarily federal in character; and, therefore, removal under 28 U.S.C. § 1441(a) was proper). "Where

a complaint raises issues to which federal law applies with complete preemptive force, the [c]ourt must look beyond the face of the complaint in determining whether remand is proper." *Green v. Arizona Cardinals Football Club, LLC*, 21 F. Supp.3d 1020, 1025 (E.D. Mo. 2014).  As further explained by the Eighth Circuit, the exception to the well-pleaded complaint rule applies where a federal statute provides "an exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies governing that cause of action."  *Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 248 (8th Cir. 2012).  Thus, although a plaintiff has only filed state law claims, a court may conclude that the plaintiff has "simply brought a mislabeled federal claim, which may be asserted under some federal statute."  *Johnson*, 701 F.3d at 247 (internal quotation marks and citation omitted).

**LEGAL FRAMEWORK**

The Atomic Energy Act of 1954 (AEA), as amended, 42 U.S.C. §§ 2011-2281, "grew out of Congress' determination that the national interest would be best served if the Government encouraged the private sector to become involved in the development of atomic energy for peaceful purposes under a program of federal regulation and licensing."  *Pacific Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 206-207 (1983).  "[AEA] implemented this policy decision by providing for licensing of private construction, ownership, and operation of commercial nuclear power reactors."  *Id.*

at 207 (*citing Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 63 (1978)).   In 1957, after it "'became apparent that profits from the private exploitation of atomic energy were uncertain and the accompanying risks substantial,'" Congress amended the AEA with the PAA, 42 U.S.C. § 2011, *et seq.*, "which provided certain federal licensees with a system of private insurance, Government indemnification, and limited liability for claims of 'public liability.'"[4] *El Paso Natural Gas. Co. v. Neztsosie*, 526 U.S. 473, 476 (1999) (*quoting Duke Power*, 438 U.S. at 63 and 42 U.S.C. § 2014(w)).

The PAA had three "central elements."   The first element was to "set a ceiling on the aggregate liability which could be imposed upon those engaged in the use and handling of radioactive material either through a contract with the Federal Government or under a license issued by the Federal Government for the private development of such activities."   *In re TMI Litigation Cases Consol. II* (*TMI II*), 940 F.2d 832, 852 (3rd Cir. 1991).   The second element channeled liability in that "any entity exposed to potential liability for activity resulting in a nuclear incident, even if it were not a direct participant in the activity, was entitled to indemnification."   *Id.*   (internal quotation marks and citation omitted).   Finally, the PAA provided that "all public liability claims above the amount of required

---

[4]   For a comprehensive history of the Price-Anderson Act *see* Dan M. Berkovitz, *Price-Anderson Act: Model Compensation Legislation? – The Sixty-Three Million Dollar Question*, 13 Harv. Envtl. L. Rev. 1 (1989).

private insurance protection would be indemnified by the Federal Government, up to the aggregate limit on liability." *Id.* (internal quotation marks and citation omitted).

The PAA "mandated that an assured 'pool' of available funds be established to cover certain liabilities which might arise out of activities related to licenses." *Gilberg v. Stepan Co.*, 24 F. Supp.2d 325, 333 (D. N.J. 1998), *disagreed with on other grounds*, *Estate of Ware v. Hosp. of the Univ. of Penn*, 871 F.3d 273 (3rd Cir. 2017). A licensee "was required as a condition of its license to maintain 'financial protection,' consisting of either 'private insurance, private contractual indemnities, self insurance, [or] other proof of financial responsibility.'" *Gilberg*, 24 F. Supp.2d at 333. (*quoting* 42 U.S.C. §§ 2210(a) & (b)). The AEC itself "was required to enter into an indemnification agreement with any licensee who was required by license to maintain financial protection." *Id.* (citing 42 U.S.C. § 2210(c)).

Among other things, as relevant, the PAA was amended in 1988 to "alter the breadth of the compensation system to cover activity related to disposal of nuclear waste," to "create[] a federal cause of action," and to "channel[] liability to licensees." *TMI II*, 940 F.2d at 853-54. The amendments to the PAA also provided "for removal of, and original federal jurisdiction over, claims arising from a 'nuclear incident,'" as discussed further below. *Id.* at 853.

Pursuant to the 1988 amendments, "public liability action" is defined by the

PAA, 42 U.S.C. § 2014(hh), as follows:

> The term "public liability action," as used in section 2210 of this title, means any suit asserting public liability. A public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the *nuclear incident* involved occurs, unless such law is inconsistent with the provisions of such section.

(emphasis added).

This definition of public liability action "had the effect of creating a federal

cause of action under the [PAA] for public liability claims arising out of a nuclear

incident." *Gilberg*, 24 F. Supp.2d at 339 (*citing TMI II*, 940 F.2d at 857). Thus, a

"public liability action" requires a "nuclear incident." *TMI II*, 940 F.2d at 855.

As relevant, "public liability" is defined by the PAA, 42 U.S.C. § 2014(w),

as:

> any legal liability arising out of or resulting from a nuclear incident . . . except . . . (iii) whenever used in subsections (a), (c), and (k) of section 2210 of this title, claims for loss of, or damages to, or loss of use of property which is located at the site of and used in connection with the licensed activity where the nuclear incident occurs. "Public liability" also includes damage to property of persons indemnified: *Provided*, That such property is covered under the terms of the financial protection required, except property which is located at the site of an used in connection with the activity where the nuclear incident occurs.

"Nuclear incident," is defined, in relevant part, by the PAA, 42 U.S.C. §

2014(q), as:

> *any occurrence, including an extraordinary nuclear occurrence*,
> within the United States causing, within or outside the United States,
> bodily injury, sickness, disease, or death, or loss of or damage to
> property, or loss of use of property, *arising out of or resulting from
> the radioactive, toxic, explosive or other hazardous properties of
> source*, special nuclear, *or byproduct material*. . . . And provided
> further, That as the term is used in section 2210(c) of this title, it shall
> include any such occurrence outside both the United States and any
> other nation if such occurrence arises out of or results from the
> radioactive, toxic, explosive, or other hazardous properties of source,
> special nuclear, or byproduct material licensed pursuant to
> subchapters V, VI, VII, and IX of this division, which is used in
> connection with the operation of a licensed stationary production or
> utilization facility or which moves outside the territorial limits of the
> United States in transit from one person licensed by the Nuclear
> Regulatory Commission to another person licensed by the Nuclear
> Regulatory Commission.

(emphasis added).

"Extraordinary nuclear occurrence" is defined by the PAA, 42 U.S.C. §
2014(j), in relevant part, as:

> any event causing a discharge or dispersal of source, *special nuclear,
> or byproduct material* from its intended place of confinement in
> amounts *offsite*, or causing radiation levels offsite, which the Nuclear
> Regulatory Commission or the Secretary of Energy, as appropriate,
> determines to be substantial, and which the Nuclear Regulatory
> Commission or the Secretary of Energy, as appropriate, determines
> has resulted or will probably result in *substantial damages to persons
> offsite or property offsite*. . . . The Nuclear Regulatory Commission
> or the Secretary of Energy, as appropriate, shall establish criteria in
> writing setting forth the basis upon which such determination shall be
> made. As used in this subsection, *"offsite" means away from "the
> location"* or "the *contract location*" as defined in the applicable
> Nuclear Regulatory Commission or the Secretary of Energy, as
> appropriate, *indemnity agreement, entered into pursuant to section
> 2210 of this title*.

(emphasis added).

As relevant, the PAA, 42 U.S.C. § 2014(t), further explains, in regard to the term "persons indemnified," that:

> The term "person indemnified" means (1) with respect to a nuclear incident occurring within the United States or outside the United States as the term is used in section 2210(c) of this title, . . . *the person with whom an indemnity agreement is executed or who is required to maintain financial protection, and any other person who may be liable for public liability . . . .*

(emphasis added).

As stated above, the PAA's jurisdictional provision, 42 U.S.C. § 2210(n)(2), vests district courts with original jurisdiction over "any public liability action arising out of or resulting from a *nuclear incident*," and expressly authorizes removal by a defendant of any such action commenced in state court to the district court "in the district where the nuclear incident [took] place." (emphasis added). Specifically, § 2210(n)(2) was amended, in 1988, to substitute the phrase "*nuclear incident*" for the phrase "*extraordinary nuclear occurrence.*" *Gilberg*, 24 F. Supp.2d at 339. This change has been interpreted as an expansion of federal jurisdiction. *Id.* (*citing TMI II*, 940 F.2d at 832). *See also Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir. 2000) (amending § 2210(n)(2) to cover nuclear incidents rather than extraordinary nuclear occurrences expanded federal jurisdiction). As explained by the Third Circuit:

> With the federal jurisdiction and removal provisions set forth in the

Amendments Act, Congress ensured that all claims resulting from a given nuclear incident would be governed by the same law, provided for the coordination of all phases of litigation and the orderly distribution of funds, an assured the preservation of sufficient funds for victims whose injuries may not become manifest until long after the incident. . . . . Thus, Congress clearly intended to supplant all possible state causes of action *when the factual prerequisite of the statute are met*.

*TMI II*, 940 F.2d at 856–57 (emphasis added).

Significantly, the structure of the PAA, as set forth in the above quoted provisions, has been described as "complicated," "interlocking," and "us[ing] words in unintuitive ways." *Estate of Ware*, 2017 WL 4105935, at *4.

## DISCUSSION

Although a federal question is not overtly presented on the face of Plaintiffs' Complaint, Defendants removed this matter based on their position that Plaintiffs' cause of action arises out of the PAA, and that, therefore, the Court has subject matter jurisdiction. S*ee Caterpillar*, 482 U.S. at 392. Subsequently, Plaintiffs filed the Motion to Remand now under consideration. In the Motion to Remand, Plaintiffs argue that this Court does not have federal subject matter jurisdiction because: Federal jurisdiction is not created under the PAA unless a "nuclear incident" has been alleged; "a 'nuclear incident' can occur only when the defendants are either licensed participants in the nuclear industry or a party to an indemnification agreement under 42 U.S.C. § 2210"; "where there is no such license or agreement, the PAA does not apply and federal jurisdiction does not

exist"; "Defendants do not dispute Plaintiffs' allegations that they are not licensed and are not subject to an indemnification agreement"; "[a]s such, Plaintiffs have not plead a 'nuclear incident'"; and Plaintiffs' claims, therefore, are based exclusively on State law and are not subject to federal jurisdiction. (ECF 21 at 1; ECF 22 at 5). Plaintiffs also argue that, were this Court to find the PAA applicable to their claims, their Constitutional right to Due Process would be violated. (ECF 22 at 14-15).

In their Response to the Motion to Remand, Defendants argue that Plaintiffs' claims "fall squarely in the purview of the PAA's federal jurisdiction provision," and that Plaintiffs cannot "escape the PAA by suing only those entities connected to the nuclear weapons industry in St. Louis that did not have a license or direct indemnification agreement with the federal government." (ECF 32 at 6). Defendants further contend that "regardless of whom, if anyone caused [the] nuclear incident, liability would be channeled to the licensee and payment would be obtained from the compensation pool" established by the PAA. (ECF 32 at 7) (internal citations omitted).

Clearly, Plaintiffs allege, and Defendants do not dispute, that the Landfills neither had a license nor an indemnity agreement as contemplated by the PAA. Thus, for the purpose of determining whether it has subject matter jurisdiction, the Court must determine whether the PAA can apply without an applicable license or

indemnity agreement. Alternatively, the Court must consider whether federal subject matter jurisdiction can be asserted based on Cotter's 1969 Source Material License.[5]

The Court will first consider whether a license or an indemnity agreement is required for federal subject matter jurisdiction pursuant to the PAA. As stated above, the PAA, 42 U.S.C. § 2210(n)(2), provides for federal subject matter jurisdiction for public liability actions arising of a nuclear incident. The courts, however, have "varied and conflicting" opinions, "both in terms of what the [PAA] requires [for federal subject matter jurisdiction] and what activities are covered." *Estate of Ware v. Hosp. of the Univ. of Penn.*, 73 F. Supp.3d 519, 526, 530 (E.D. Pa. 2014), *aff'd*, 871 F.3d 273 (3rd Cir. 2017).

---

[5] Defendants have not submitted evidence that Cotter had an indemnity agreement, but, for purposes of the pending Motion, only, the Court will assume that, because Cotter was granted the 1969 Source Material License, it had an indemnity agreement. *See* 42 U.S.C. § 2210(a) ("Each license issued . . . for the public purposes cited in section 2012(i) of this title, have as a condition of the license a requirement that the licensee have and maintain financial protection of such type and in such amounts as the Nuclear Regulatory Commission (in this section referred to as the "Commission") in the exercise of its licensing and regulatory authority and responsibility shall require in accordance with subsection (b) of this section to cover public liability claims. Whenever such financial protection is required, it may be a further condition of the license that the licensee execute and maintain an indemnification agreement in accordance with subsection (c) of this section."); 42 U.S.C. § 2210(c) ("The Commission shall, with respect to licenses issued between August 30, 1954, and December 31, 2025, for which it requires financial protection of less than $560,000,000, agree to indemnify and hold harmless the licensee and other persons indemnified, as their interest may appear, from public liability arising from nuclear incidents which is in excess of the level of financial protection required of the licensee.").

In *Gilberg*, 24 F. Supp.2d at 343, 345-46, recently criticized by the Third Circuit in *Estate of Ware*, 871 F.3d at 283, the court held that, in order for there to be a "public liability action" under the PAA, an indemnity agreement is required; hence, there can be no federal subject matter jurisdiction without an indemnity agreement. To reach this conclusion, the court in *Gilberg*, 24 F. Supp.2d at 331-32, reasoned:

> "[I]t is axiomatic that statutory interpretation begins with the language of the statute itself. Courts presume that Congress expressed its legislative intent through the ordinary meaning of the words it chose to use, and if the statutory language is unambiguous, the plain meaning of the words ordinarily is regarded as conclusive." *In re TMI*, 67 F.3d 1119, 1123 (3d Cir. 1995) (citation omitted) [citations omitted]. Taken in isolation, the word "occurrence" conveys a broad meaning. Webster, for example, defines occurrence as "something that takes place" or "the action or process of happening or taking place." Webster's New International Dictionary 1561 (3d ed.1976). Random House defines it as "the action, fact or instance of occurring" and "something that happens; [an] event [or] incident." *Random House Dictionary of the English Language* 1340 (2d ed.1987).
>
> However, "it is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation. but must be drawn from the context in which it is used." *Textron Lycoming Reciprocating Engine Div. v. United Auto., Aerospace and Agric. Implement Workers of Am.,* 523 U.S. 653, -, 118 S.Ct. 1626, 1629, 140 L.Ed.2d 863 (1998) (quoting *Deal v. United States*, 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993)). In this regard, it is significant that the definition of nuclear incident employs "occurrence" in concert with the clause "including an extraordinary nuclear occurrence," so as to read, "[t]he term 'nuclear incident' means any occurrence, including an extraordinary nuclear occurrence." § 2014(q).

The court then concluded that:

> In the absence of an indemnification agreement, entered into under 42 U.S.C. § 2210 and covering the activities which gave rise to the liability alleged, there can be no "occurrence," that is, no event at the site of "licensed activity," that would constitute a "nuclear incident." Without a nuclear incident, there is no claim for public liability, and without a claim for public liability, there is no federal jurisdiction under Price-Anderson.

24 F. Supp.2d at 340.

The court in *Gilberg*, noted that case law did not make it clear whether the PAA's "jurisdictional provisions operate independently from its indemnification provisions," and that "a paraphrase of the definition of 'nuclear incident' [does not] lead to the conclusion that the [PAA] employs the word 'occurrence' more narrowly than its ordinary meaning." The court concluded, however, that "whether as a matter of statutory construction or the structure and history of the Act, no claim for public liability can lie in the absence of an applicable indemnity agreement." *Gilberg*, 24 F. Supp.2d at 343. *See also Joseph v. Sweet*, 125 F. Supp.2d 573, 576 (D. Mass. 2000) ("[T]he prerequisite for a claim to fall within the scope of the [PAA] [is] the existence of an indemnification agreement between the government and the defendant with respect to the complained of activity.") (*citing Heinrich v. Sweet*, 62 F. Supp.2d 282, 296-97 (D. Mass. 1999)).

In *Samples v. Conoco, Inc.*, 165 F. Supp.2d 1303 (N.D. Fl. 2001), also criticized by the Third Circuit in *Estate of Ware*, 871 F.3d at 283, the court

considered whether a *license* is necessary for federal subject matter under the PAA. The defendant argued that the court had subject matter jurisdiction pursuant to the PAA because the plaintiffs' lawsuit was a "public liability action" under the PAA, given that the plaintiffs sought to recover damages for injuries "arising out of or resulting from a nuclear incident."  The defendant claimed that the "clear language of the PAA covers *any* claim of injury to property allegedly caused by certain nuclear material" and that "Congress did not limit the scope of the PAA's 'public liability' provisions to Nuclear Regulatory Commission (NRC) *licensees* and Department of Energy (DOE) contractors."  *Id.* at 1320-21 (first emphasis in original and second emphasis added).  Calling the defendant's argument "Hogwash," the court held that "the word 'occurrence' as used in the definition of 'nuclear incident' means 'that event at the site of the *licensed activity, or activity for which the Commission has entered into a contract,* which may cause damage." *Id.* at 1321 (emphasis in original) (quoting S. REP. NO. 296, at 16 (1957) (quoted in 10 C.F.R. § 8.2 at 202 (2001)).  Noting that there had not been a nuclear incident, the court concluded that, because the defendant failed to demonstrate that it was a DOE contractor or a NRC licensee, the case did not state a claim under the PAA. *Id.* at 1321-22.

Plaintiffs argue that *Cook v. Rockwell International, Corp.*, 790 F.3d 1088 (10th Cir. 2015), is dispositive of the issues before the Court as it held that, "when a

case involves harm caused by nuclear materials, but does not meet the definition of 'nuclear incident,' it is not pre-empted by the PAA." (ECF 22 at 12). The Tenth Circuit had earlier held, in the same case, 618 F.3d 1127, 1140 (10th Cir. 2010), that "a plaintiff must establish an *injury sufficient to constitute a nuclear incident* as a threshold, substantive element of any PAA claim." (emphasis added). Upon remand to the district court, the plaintiffs "disclaimed any effort to prove a nuclear incident for purposes of the [PAA]," and argued that the PAA's "liability limiting and indemnification protections [then] fell away, leaving background state tort law to operate normally." *Cook*, 790 F.3d at 1091. In response, the defendants argued that the PAA preempts any state law recovery where a nuclear incident is asserted but ultimately unproven, and that "if you allege and then fail to prove a nuclear incident you are barred from recovery of any kind - even if you can establish a qualifying state law nuisance." Additionally, the defendants argued that the "court's mandate in the first appeal independently barred the plaintiffs from securing relief on their existing state law nuisance verdict," so that "even if the plaintiffs' state law claim [was not] preempted[,] any recovery [was] just as effectively foreclosed." *Id.* at 1092. The district court ruled in the defendants' favor and the plaintiffs appealed. *Id.* The Tenth Circuit reversed, finding in favor of the plaintiffs, and specifically holding that the PAA "does not preempt and preclude a freestanding state law nuisance claim when a nuclear incident is alleged

but unproven," and that "the first panel's mandate, as a formal matter, [could not] be read to preclude the entry of a freestanding state law nuisance judgment." *Id.* at 1103-04. Thus, while *Cook*, 790 F.3d 1088, is helpful, it is not dispositive of the specific issue of whether a license or indemnity agreement is a prerequisite for federal subject matter jurisdiction pursuant to the PAA.

Notably, contrary to *Gilberg*, 24 F. Supp.2d 325, courts have held that a license or an indemnification agreement is ***not*** a prerequisite for federal subject matter jurisdiction pursuant to the PAA. In *Acuna*, 200 F.3d at 339, where employees and others sued uranium mining and processing companies for personal injuries, the Fifth Circuit addressed the issue of whether jurisdiction under the PAA is "contingent on whether the occurrence took place in a state which regulates its own uranium industry under NRC guidelines, or whether the facility is covered under the separate indemnification portions of the [PAA]." Criticizing *Gilberg*, 24 F. Supp.2d 325, the Fifth Circuit held:

> *There is nothing in the definition of "nuclear incident" which suggests it should be contingent on . . . whether the facility is covered under the separate indemnification portions of the Act*. "Nuclear incident" is not limited to a single, catastrophic accident: indeed, one purpose behind the 1988 amendments was to expand the scope of federal jurisdiction beyond actions arising from "extraordinary nuclear occurrences" only. *See Kerr–McGee Corp. v. Farley*, 115 F.3d 1498, 1502 (10th Cir. 1997). Plaintiffs' attempts to reintroduce the limitations of "extraordinary nuclear occurrence" into the 1988 amendments' substitution of "nuclear incident" rely on faulty statutory interpretation and are contrary to Congressional intent. *See Carey v. Kerr-McGee Chem. Corp.*, 60 F. Supp.2d 800, 803-07 (N.D.

Ill. 1999) (analyzing history and impact of § 2210(n)(2) and refuting the same arguments made by plaintiffs in the instant case contained in *Gilberg v. Stepan Co.*, 24 F. Supp.2d 325 (D. N.J. 1998)).

*Acuna*, 200 F.3d at 339.

Also, in *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1378 (C.D. Ill. 1992), where the plaintiff sued *both* a nuclear power plant licensee and a contractor, the court noted that, upon passing the PAA, "Congress recognized that a nuclear incident might be caused by any number of participants in the nuclear industry beyond the actual licensee," and "through mandatory indemnification provisions, channeled all public liability to licensees, and away from non-licensees, . . . who might otherwise have borne such liability under ordinary tort law." *See also Estate of Ware,* 73 F. Supp.3d at 530 (acknowledging that courts would find to the contrary but holding that the "PAA is [not] limited to nuclear incidents occurring at utilization and production facilities and other licensed facilities") (internal quotation omitted); *Carey v. Kerr-McKee Chem. Co.*, 60 F. Supp.2d 800, 806 (N.D. Ill. 1999) ("Under *Gilberg*'s analysis, the phrase 'to which an indemnity agreement applies' would be superfluous, because there could be no ENO without an indemnity agreement. The inclusion of the phrase clearly indicates Congress' belief that there can be an ENO to which no indemnity agreement applies.").

Most recently, in *Estate of Ware*, 871 F.3d at 283, upon affirming the district court's decision, the Third Circuit specifically rejected the holding in *Gilberg*, 24

F. Supp.2d at 339, that an indemnity agreement is a prerequisite for federal subject matter jurisdiction under the PAA, and held that it was "unpersuaded that an indemnification agreement is necessary to trigger the [PAA's] applicability." Upon finding that there was federal subject matter jurisdiction based on the PAA, the Third Circuit considered that the defendant, a university, had a *license* from the Pennsylvania Department of Environmental Protection Bureau of Radiation Protection, and that the State-issued license was not "meaningfully different . . . from a license issued directly by the NRC." *Estate of Ware*, 871 F.3d. at 284. Significantly, in response to the plaintiff's additional argument that the PAA applies only when a defendant has a *license* to possess nuclear materials, the Third Circuit held:

> Indeed, § 2210(k)'s reference to "any license issued" under the federal scheme for atomic energy could be read to suggest that universities are covered by Price-Anderson *only when they hold a license* to use the materials involved in any nuclear incident. One District Court has held that, regardless of the type of institution in question, the Act applies exclusively to entities holding licenses. *Irwin v. CSX Transp., Inc.*, No. 3:10-CV-300, 2011 WL 976376, at *2 (E.D. Tenn. Mar. 16, 2011). And the unpersuasive *Samples* opinion [*Samples v. Conoco, Inc.*, 165 F. Supp.2d 1303, 1321 (N.D. Fla. 2001)] . . . gives a nod to that view as well, 165 F. Supp.2d at 1321 ("the word occurrence as used in the definition of nuclear incident means that event at the site of the *licensed activity*, or *activity for which the Commission has entered into a contract*, which may cause damage" (internal quotation marks and citations omitted) (emphasis in original)).

*Estate of Ware*, 283 F.3d. at 283 (emphasis in original).

Also, in *Cotromano v. United Techs. Corp.*, 7 F. Supp.3d 1253, 1257 (S.D.

Fl. 2014), the court rejected the plaintiff's argument that that "there can be no federal jurisdiction unless the Defendants show 'adequate financial protection' and an 'indemnification agreement,'" and reasoned that "[t]he plain language of the [PAA] indicates that the possession of a license for radioactive material is unrelated to the jurisdiction issue. None of the statutory definitions limit[s] the jurisdiction over nuclear claims to licensed activity." In conclusion, the court held that, under the PAA, "financial protection is a condition of obtaining a license, not a condition of establishing jurisdiction," and that "whether or not [the] [d]efendants [had] indemnification agreements with the federal government [was] not dispositive of the applicability" of the PAA to that case. *Id.* at 1259.

Given the varied and conflicting opinions regarding what is required for federal subject matter jurisdiction pursuant to the PAA, the Court notes that the following legislative history of the PAA, S. REP. NO. 85-296, 1957 WL 5103, at *1817-18 (May 9, 1957), is instructive, even though it addresses the relevant statutory terms prior to the 1988 Amendments to the PAA, as it states:

> IT WAS NOT THOUGHT THAT AN INCIDENT WOULD NECESSARILY HAVE TO OCCUR WITHIN ANY RELATIVELY SHORT PERIOD OF TIME. . . . THE *OCCURRENCE* WHICH IS THE SUBJECT OF THIS DEFINITION *IS THAT EVENT AT THE SITE OF THE LICENSED ACTIVITY*, OR ACTIVITY FOR WHICH THE COMMISSION HAS ENTERED IN TO A CONTRACT, WHICH MAY CAUSE DAMAGE, RATHER THAN THE SITE WHERE THE DAMAGE MAY PERHAPS BE CAUSED. THE SITE MUST BE WITHIN THE UNITED STATES. . . . *IT DOES NOT MATTER WHAT LICENSE MAY BE APPLICABLE* IF THE

OCCURENCE IS WITHIN THE UNITED STATES. . . . *THE INDEMNIFICATION AGREEMENTS ARE INTENDED TO COVER DAMAGES CAUSED BY NUCLEAR INCIDENTS* FOR WHICH THERE MAY BE LIABILITY NO MATTER WHEN THE DAMAGE IS DISCOVERED, I.E., EVEN AFTER THE END OF THE LICENSE. THAT IS WHY THE DEFINITION OF 'NUCLEAR INCIDENT' HAS THE PHRASE 'ANY OCCURENCE * * * CAUSING BODILY INJURY, SICKNESS, DISEASE, OR DEATH' AND WHY THE DEFINITION OF 'PUBLIC LIABILITY' IS TIED TO ANY LEGAL LIABILITY ARISING OUT OF, OR RESULTING FROM, A NUCLEAR INCIDENT.

(emphasis added).[6]

It is implicit in the language of the above quoted legislative history that the terms "nuclear incident" and "occurrence" are inextricably intertwined with "licenses" and "indemnification agreements," thus suggesting licenses and indemnification agreements are an integral part of the PAA's statutory scheme and that there cannot be a nuclear incident without an applicable license or indemnity agreement.

Nonetheless, the Court is faced with "competing preemption narratives." Guidance in such a situation is provided by *Cook*, 790 F.3d at 1094, notably authored by now Justice Gorsuch. *Cook* holds:

[T]he Supreme Court has instructed us to "start with the assumption that the historic police powers of the States were not to be superseded . . . unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.

---

[6] The above quoted legislative history does suggest that it is of no consequence, in the matter under consideration, that Cotter's 1969 Source Material License expired in 1974.

Ed. 1447 (1947). So to the extent Congress's statutory direction is susceptible to more than one reading, we have the "duty to accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005). A duty that is only "heightened" where (as here) the area of law in question is one of traditional state regulation like *public health and safety*. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 334, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008). These presumptions seek to ensure "that the federal-state balance will not be disturbed unintentionally by Congress or unnecessarily by the courts." *Id.* (*quoting Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)) (internal quotation marks omitted). And applying the traditional tools of statutory interpretation to [the PAA], it quickly becomes clear that nothing in its *language, structure, or history favors* the defendants' curious statutory construction over the plaintiffs' prosaic one-let alone favors it so clearly that we might overcome the presumption against preemption.

*Cook*, 790 F.3d at 1094 (emphasis added). *See also Hughes v. Ester C Co.*, 99 F. Supp.3d 278, 283 (E.D. N.Y. 2015) ("[W]here the text of a preemption clause is ambiguous or open to more than one plausible reading, courts 'have a duty to accept the reading that disfavors pre-emption.'") (*quoting Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449 (2005) (other citations omitted).

Given the conflicting interpretations of the PAA regarding whether there must be a license or an indemnity agreement for the PAA to apply and, hence, for a federal court to have subject matter jurisdiction, and considering that conflicts should be resolved by finding no federal preemption, the Court finds that this matter should be resolved in favor of finding that there cannot be federal jurisdiction under the PAA without a license or an indemnity agreement. *See*

*Cook*, 790 F.3d at 1094; *Hughes*, 99 F. Supp.3d at 283; *Gilberg*, 24 F. Supp.2d at 343. In any case, the Court finds persuasive authority holding that, "whether as a matter of statutory construction or the structure and history of the PAA," a license or an indemnity agreement is a prerequisite for federal subject matter jurisdiction pursuant to the PAA. *Gilberg*, 24 F. Supp.2d at 343.

To the extent a license is required for federal jurisdiction under the PAA, Defendants contend that Cotter's 1969 Source Material License provides a basis for federal jurisdiction under the PAA merely because the radioactive material at issue came from Cotter's Latty Avenue facility. Defendants contend it is inconsequential that Cotter is not a party to the instant lawsuit. (ECF 10, ¶ 41; ECF 32 at 6-7).

As argued by Plaintiffs, Cotter's license, issued in December 1969, was for "source" material, not "radioactive waste," "leached barium sulfate residues," or "radiological waste," the material which is the subject of Plaintiffs' Complaint. (ECF 10, ¶¶ 1, 43-45). Thus, assuming that a license is required for federal subject matter pursuant to the PAA, the Court fails to see how Cotter's 1969 Source Material License applies to Plaintiffs' claims.

Plaintiffs also argue that the radioactive waste at issue was specifically "uranium mill tailings"; that Defendants "concede" that uranium mill tailings "are what's buried on their property"; that Defendants "proclaim that the material they

took possession of in 1973 is uranium mill tailings"; that uranium mill tailings were not subject to PAA licensing until 1978; and that, therefore, Cotter's 1969 Source Material License cannot be a basis for federal subject matter jurisdiction in this matter. (ECF 38 at 4-6) (citing ECF 16 (Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint) at 4 n.2) (citing U.S Army Corps of Engineers' website).

Indeed, in their Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint, Defendants cite the U.S. Army Corps of Engineers' website's statement that the that the material sent to the West Lake Landfill "would qualify as 'byproduct' material, which is defined in part as 'the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content.'" (ECF 16 at 4 n.2 (quoting 42 U.S.C. § 2014(e)(2)). Plaintiffs' Complaint, however, does not specifically allege that the material deposited at the Landfills was uranium mill tailings, and, notably, Defendants do not specifically acknowledge, nor does the record reflect that, the material deposited at the Landfills was, in fact, uranium mill tailings.

In any case, to the extent the material at issue is uranium mill tailings, in 1969, when Cotter obtained the Source Material License, and, in 1973, when the Landfills allegedly accepted the material at issue, the definition of "byproduct material" did not include uranium or thorium mill tailings. It was not until 1978

that Congress expanded the definition of "byproduct material" to include uranium and thorium mill tailings.[7] 42 U.S.C. § 2014(e)(2). *See Kerr-McGee Chem. Corp. v. U.S. Nuclear Regulatory Comm'n*, 903 F.2d 1, 2-3 (D.C. Cir. 1990) ("The AEA made no provision for regulating waste materials generated during the extraction or concentration of source material."; "[b]y the 1960's and early 1970's, federal and state authorities began to realize that wastes, or 'mill tailings,' resulting from the extraction or concentration of source material posed a significant public health problem."; "Title II brought mill tailings within the NRC's licensing authority by adding a new category to the AEA's definition of byproduct material, namely, the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content.") (*quoting* 42 U.S.C. § 2014(e)(2)).

Notably, the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA), which first included uranium mill tailings in the definition of

---

[7] PL 95-604 (HR 13650), Nov. 8, 1978, 92 Stat. 3021, Title II – Uranium Mill Tailings Licensing and Regulation Definition, Sec. 201, which states:

42 USC 2014. is amended to read as follows: "e. The term 'byproduct material' means (1) any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material, and (2) the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content."

byproduct material, states that, except as otherwise provided by 42 U.S.C. § 2014, the amendments made by Title II of the UMTRCA "shall take effect on the date of the enactment of this Act." PL 95-604 (HR 13650), Nov. 8, 1978, 92 Stat. 3021, Title II - Uranium Mill Tailings Licensing and Regulation Definition, Sec. 208. Moreover, "[r]etroactivity [is] not favored in the law," and "[C]ongressional enactments . . . will not be construed to have retroactive effect unless their language requires this result." *Simmons v. Lockhart*, 931 F.2d 1228, 1230 (8th Cir. 1991) (*quoting Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). Thus, Cotter's 1969 Source Material License could not have covered uranium mill tailings.

Defendants cite several cases for their argument that this Court has federal subject matter jurisdiction under the PAA because Cotter may ultimately be held liable for Plaintiffs' damages. Unlike the matter under consideration, however, in the cases cited by Defendants for this proposition, the *plaintiffs had sued licensees*, who were owners or operators of nuclear power plants, in addition to defendants who were not licensed but who *performed services* for the licensees *at the nuclear power plants*. As such, these cases are not dispositive of whether Cotter may ultimately be held liable for Plaintiffs' damages. *See e.g.*, *Kiick v. Metro. Edison Co.*, 784 F.2d 490, 491 (3rd Cir. 1986) (stating that owners and operators of the nuclear facility at which the nuclear accident giving rise to the plaintiffs' claims

took place were each a "person indemnified" under the PAA, "along with those companies that supplied design, engineering, or maintenance services, or that were vendors of systems or equipment incorporated in the facility"); *Corcoran*, 935 F. Supp. 376 at 390 (holding that deceased maintenance worker's employer, which was a *contractor at the nuclear power plant that was the site of the nuclear accident* causing the deceased's injuries, might be indemnified; plaintiff had sued the "nuclear power licensee" as well as the deceased's employer); *O'Conner v. Commonwealth Edison, Co.*, 807 F. Supp. 1376, 1378 (C.D. Ill. 1992) (holding, where power plant worker sued plant licensee, that a contractor of the plant could not be "separately [] liable to [the] plaintiff in any manner in this case."; "there can only be one liability pursuant to Price-Anderson and that liability is channeled solely through the licensee and through the financial protection provided by Price-Anderson"; "[a]ny disagreements between defendants as to who might have done what wrong are irrelevant to [the plaintiff's] claim for compensation under Price-Anderson."); *Smith v. Gen. Elec. Co.*, 936 F. Supp. 70, 77 (D. Mass. 1996) ("The purpose of the channeling provision of the Price-Anderson Act is to make third party vendors . . . of nuclear plant operators . . . indemnitees of nuclear plant operators . . . . The Act does not exonerate [the third party vendors] of [their] legal liability, it merely shifts the obligation to pay damages to [the nuclear plant operators].").

The Court finds, therefore, without merit Defendants' argument that Cotter's 1969 Source Material License provides a basis for federal subject matter jurisdiction pursuant to the PAA even though Cotter is not a party to the instant lawsuit. Further, for the above stated reasons, including that a license or indemnity agreement are required for federal subject matter pursuant to the PAA, the Court finds that Defendants have not met their burden of establishing federal subject matter jurisdiction, and that Plaintiffs' Motion to Remand should be granted. *Caterpillar*, 482 U.S. at 392; *Cook*, 790 F.3d at 1094-95.

Given the Court's finding that it does not have subject matter jurisdiction and that this matter should be remanded to State court, the Court need not determine the merits of Plaintiffs' due process argument. *But see, Cook*, 790 F.3d at 1099 n.3 (finding that the plaintiffs' argument that, "[a]s a matter of due process, [] Congress cannot eliminate longstanding common law rights without providing any 'reasonable alternative remedy' unless there is a 'compelling' reason to do so," was not a "trivial argument") (quoting *PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 93-94 (1980)).

## CONCLUSION

For the reasons stated above, the Court finds that Plaintiffs' Motion to Remand should be granted.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion to Remand (ECF 21) is **GRANTED**;

**IT IS FURTHER ORDERED** that a separate Order of Remand shall issue; and

**IT IS FINALLY ORDERED** that the Clerk of Court shall take appropriate action to assure this matter is remanded to the Circuit Court of the St. Louis County, Missouri.

Dated this 20th Day of October 2017.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE